**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Raymond P. Moore**

Civil Action No. 14-cv-2325-RM-MJW

CARGILL INCORPORATED, a Delaware corporation,

     Plaintiff,

v.

JASON KUAN,

     Defendant.

---

**ORDER DENYING
PLAINTIFF CARGILL INCORPORATED'S MOTION FOR A TEMPORARY
RESTRAINING ORDER AND PRELIMINARY INJUNCTION (ECF NO. 2)**

---

THIS MATTER is before the Court on Plaintiff Cargill Incorporated's Motion for a

Temporary Restraining Order and Preliminary Injunction ("Motion") (ECF No. 2) requesting, as

relevant to this Order, the issuance of a preliminary injunction to prevent Defendant Jason Kuan

from working as the President of the "case ready" business of JBS USA, a Cargill competitor.

At issue is whether Mr. Kuan has "threatened" to and/or would "inevitably" disclose Cargill

trade secrets such that he should be enjoined for one (1) year from working at JBS in North

America.  An evidentiary hearing was held on September 24, 2014, and the parties submitted

briefs on October 1, 2014.  The Court has diversity jurisdiction pursuant to 28 U.S.C. § 1332(a).

Upon consideration of the Motion, the Court file, the arguments and evidence presented at the

hearing (including assessing the credibility of the witnesses), and the applicable rules, statutes

and case law, and being otherwise fully advised, Cargill's request that Mr. Kuan be enjoined

from working at JBS in any capacity relating to or concerning case ready meats for one year is

DENIED.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

Cargill is a global food and agricultural company incorporated in Delaware but

headquartered in Minnesota.  One of Cargill's business units or divisions is the Case Ready

Division which is operated in the United States and Canada.  In this division, Cargill cuts large

pieces of meat into smaller sizes, packs and weighs the cut pieces individually, and then ships

these packages to retailers ready to be placed in their cases for purchase by consumers.  Cargill

serves primarily the major retailers in the U.S. and Canada.

In 1994, Mr. Kuan joined Cargill[1] in its Toronto, Ontario, Canada office after he

graduated from the University of Lethbridge in Alberta, Canada.  (Exhibit 2.)   Mr. Kuan

continued to work in the Toronto office until he was "stationed"[2] in Newnan, Georgia from

about February 1998[3] until August of 2000.  (Ex. 2.)

On August 17, 1998, while stationed in Georgia, Mr. Kuan signed an "Employee

Confidential Information, Inventions, and Original Works of Authorship Agreement."  (Ex. D.)

On January 14, 1999, also while stationed in Georgia, Mr. Kuan signed a second "Employee

Confidential Information, Inventions, and Original Works of Authorship Agreement"

("Agreement") which "supersedes and replaces" prior agreements of the same nature.  (Ex. E.)

The Agreement provides that it was made "[i]n consideration of [Mr. Kuan's] employment by

Cargill ("Cargill" as used herein includes Cargill, Incorporated, its existing and future

---

[1] Exhibit 1 (ECF No. 50) provides Mr. Kuan worked for Cargill Limited, Canada, not Cargill, Inc., but neither party raised or addressed this potential discrepancy and its effect, if any, on this action.
[2] A term used by Cargill at the hearing.
[3] Exhibit 1 provides Mr. Kuan started work in Newnan in August 1998, but whether he started in February or August is immaterial under the facts and circumstances of this case.

subsidiaries and affiliated companies)." (Ex. E.)  Although stationed in Georgia, Mr. Kuan believes he signed the Agreement in Canada.   No evidence was presented concerning the circumstances of the signing of the Agreement (or the earlier agreement), such as whether the parties engaged in any negotiations.

The Agreement requires Mr. Kuan not to "use, disclose or communicate" Cargill's confidential information or trade secrets during his employment and thereafter, and to return all confidential Cargill information upon his termination from employment.  The Agreement, however, contains no restriction on Mr. Kuan's employment upon termination.  While Cargill has non-compete agreements, it never asked Mr. Kuan to sign one.

After Georgia, Mr. Kuan was stationed in Wichita, Kansas from August 2000 to June 2007, and then stationed back to Toronto from June 1, 2007 until he resigned on August 1, 2014. (Ex. 2.)  On this record, Mr. Kuan worked in the United States for almost half his career at Cargill.

Jody Horner is president of Cargill Case Ready and Cargill Meat Solutions.  Her management team included a General Manager for Cargill's United States business and a General Manager for Cargill's Canada business.  Until June 1, 2014, Mr. Kuan was the General Manager for Cargill's Canada business.  In this position, Mr. Kuan had knowledge of and/or involvement in Cargill's customer strategies, financial affairs, plant operations, growth plans, and innovation.

In August 2013, Cargill started work on its business plan which included information concerning Cargill's financials, assessment of its competitors, customers, capacity, and

assessment of its value added business.  In March 2014, Cargill completed a draft of its business plan, the "Case Ready Strategy."  (Ex. 10.)

On June 1, 2014, Mr. Kuan changed positions, moving from the Case Ready Division in Guelph, Ontario to the Value Added or McDonald's business unit in London, Ontario.  Shortly thereafter, JBS contacted Mr. Kuan about a possible employment opportunity.  After meeting Mr. Kuan, JBS offered Mr. Kuan a position which he did not accept.  Nonetheless, negotiations continued.

On July 7, 2014, Mr. Kuan sent, via email on his Cargill issued laptop, his entire contacts file – containing Case Ready business contacts as well as personal contacts – to his personal email address.  He also downloaded onto a personal external hard drive (the "Seagate Hard Drive") some, but not all, of the folders contained on his Cargill laptop.  Many of these folders contained information about Cargill's case ready business.  Mr. Kuan testified he did so because he had backup and other technical problems on his Cargill laptop.  Mr. Kuan put the Seagate Hard Drive along with a USB drive ("Thumb Drive") and physical copies of other Cargill documents in a box (the "Box") which he kept in his car.  (Ex. 23.)  At that time, Mr. Kuan was in transition, living out of a hotel during his job change.

On Friday, August 1, 2014, Mr. Kuan accepted an offer of employment from JBS.  He gave Cargill two weeks' notice that he was leaving to work for JBS, and told Human Resources that he had some items to return.  Mr. Kuan was flying to Colorado, and was told to bring the items back to the London office when he returned.   When he was unable to return on Monday as planned, Mr. Kuan notified Human Resources that he had not been back to London but would return "a few things" when he returned.  (Ex. F.)

Mr. Kuan became a JBS employee on or about August 7, 2014.  (Exs. 28-29.)  JBS's

Code of Conduct requires Mr. Kuan to refrain from disclosing secret or confidential information

of others.  (Exs. 28-29.)  No evidence was presented that JBS requested or obtained from Mr.

Kuan any Cargill information, confidential or otherwise.

Meanwhile, Cargill conducted a forensic examination of Mr. Kuan's Cargill laptop.  It

discovered that on July 7, 2014, Mr. Kuan downloaded documents from the laptop onto a

Seagate hard drive, but not all files were copied, and transferred his contacts file via email to his

personal email address.  Thereafter, on August 21, 2014, Cargill filed its Complaint and Motion.

On August 22, 2014, Mr. Kuan (through counsel) provided the Box to Cargill (through counsel).

Thereafter, Cargill sent the Seagate Hard Drive and Thumb Drive to Cyopsis.  (ECF No. 45.)

Cyopsis found the overwhelming majority of documents on the Seagate Hard Drive were

"created," *i.e.*, downloaded, on July 7, 2014, and three documents on the Thumb Drive were

created in July 2014.  (Exs. 24-25.)  On September 15, 2014, Cyopsis returned the original drives

to Cargill, who continues to retain custody of the drives and the Box.

Meanwhile, by August 26, 2014, the parties had entered into a Stipulated Temporary

Restraining Order ("Stipulated Order") which enjoined Mr. Kuan from, among other things,

"using any Cargill highly confidential and proprietary business information and trade secrets"

during the pendency of this matter, and allowed Cargill to analyze Mr. Kuan's electronic

devices, *i.e.*, a Mac laptop.  (ECF No. 25, page 2.)

In accordance with the Stipulated Order, at some unknown date on or after August 22,

2014, Mr. Kuan provided his Mac laptop to Cargill for its examination.  On September 10, 2014,

some unknown forensic vendor created a forensic image of the Mac which was provided to

Cyopsis for review.  Cyopsis created a list of documents on the Mac responsive to the search

terms "Cargill" and "JBS," and determined that on September 10, 2014, someone "accessed"

some of the documents on that list.  The "access" could have been an antivirus or other scan of

the folder, the movement of the folder from one area to another, or a batch copy to some other

external device.  No evidence was presented that Mr. Kuan had access to or possession of the

Mac on September 10.

## II.  LEGAL STANDARD

Before a preliminary injunction may be issued, the moving party must establish: "(1) it

will suffer irreparable injury unless the injunction issues, (2) the threatened injury outweighs any

damage the proposed injunction may cause the opposing party, (3) if issued, the injunction would

not be adverse to the public interest, and (4) it has a substantial likelihood of success on the

merits."  *Okla. ex rel Okla. Tax Comm'n v. Int'l Registration Plan, Inc.*, 455 F.3d 1107, 1112-

1113 (10th Cir. 2006).  "If a movant can show the first three requirements tip strongly in his

favor, the test is modified. . . .  In such situations, the moving party may meet the requirement for

showing success on the merits by showing that questions going to the merits are so serious,

substantial, difficult, and doubtful as to make the issue ripe for litigation and deserving of more

deliberate investigation."  *Id.* at 1113 (internal citation and quotation marks omitted).  "Because

a preliminary injunction is an extraordinary remedy, the right to relief must be clear and

unequivocal."  *Greater Yellowstone Coal. v. Flowers*, 321 F.3d 1250, 1256 (10th Cir. 2003).

In this case, Cargill seeks relief based on breach of contract (the Agreement), violation of

the Colorado Uniform Trade Secrets Act ("Act"), common law conversion, and breach of

fiduciary duty.  Cargill's Motion for injunctive relief, however, is based on its claims for

violation of the Act and breach of the Agreement.  Accordingly, the preliminary injunction factors will be assessed based only on such claims.

### III.  ANALYSIS

**A.    Irreparable Harm.**

Cargill relies on not only the presumption of irreparable harm but also an argument that it has shown irreparable harm.  "When the evidence shows that the defendants are engaged in, or about to be engaged in, the act or practices prohibited by a statute which provides for injunctive relief to prevent such violations, irreparable harm to the plaintiffs need not be shown."  *Star Fuel Marts, LLC v. Sam's East, Inc.*, 362 F.3d 639, 651-52 (10th Cir. 2004) (internal alteration and quotation marks omitted).  In this case, the Act provides for injunctive relief and, accordingly, Cargill need not make a showing of irreparable harm on its claim under the Act *if* it meets its burden as to such claim.  Such a presumption, however, does not apply to Cargill's claim based on breach of contract, *i.e.*, the Agreement, and, as such, irreparable harm must be shown.

"'To constitute irreparable harm, an injury must be certain, great, actual and not theoretical.'"  *Schrier v. University of Colo.*, 427 F.3d 1253, 1267 (10th Cir. 2005) (quoting *Heideman v. South Salt Lake City*, 348 F.3d 1182, 1189 (10th Cir. 2003)).  It is "harm that cannot be undone, such as by an award of compensatory damages or otherwise."  *Salt Lake Tribune Publ'g Co., LLC v. AT & T Corp.*, 320 F.3d 1081, 1105 (10th Cir. 2003).  Simple economic loss usually does not, in and of itself, constitute irreparable harm as such losses are compensable by money damages.  *Heideman,* 348 F.3d at 1189.  The movant, however, must show a "significant risk" of irreparable harm.  *Greater Yellowstone Coal.*, 321 F.3d at 1258.

Cargill argues that if Mr. Kuan discloses or uses any of Cargill's trade secrets, Cargill's competitive advantage could be eliminated and such damage is impossible to quantify. The Court agrees that, in light of Mr. Kuan's nearly identical employment positions,[4] *if* Mr. Kuan discloses or uses more than just generalized, *i.e.*, nonspecific, trade secrets, Cargill has demonstrated it will suffer a significant risk of irreparable harm. The question, however, is whether Cargill has met its burden of showing that Mr. Kuan has or will disclose or use such trade secrets.

### B.    Balance of Harm.

This factor requires that the threatened injury to Cargill outweighs any damage that may be caused to Mr. Kuan as a result of the injunction.   Cargill argues it will be harmed without an injunction if Mr. Kuan is free to use or disclose the documents he has taken from Cargill. But, through the Stipulated Order, Mr. Kuan has returned such documents and Cargill has not argued otherwise. As for any threatened injury from the use (threatened or inevitable) of Cargill's trade secrets, assuming such use can be shown, the Court finds that although an injunction can be narrowly tailored, Mr. Kuan will nonetheless suffer some harm if he is precluded from working in the position for which he was hired. No evidence has been presented on whether JBS will continue to employ Mr. Kuan and allow him to "sit by the sidelines" for a year. Moreover, enjoining Mr. Kuan would, in effect, afford Cargill a covenant not-to-compete, something it could have bargained for but did not. Nonetheless, on balance, *if* Cargill can sufficiently demonstrate improper use by Mr. Kuan, the Court finds the balance would tip in favor of Cargill

---

[4] Mr. Kuan's positions may have different titles, but the Court finds that his duties and responsibilities at JBS are analogous to those while employed by Cargill in its case ready division.

on this factor.[5]  *See Autoskill, Inc. v. Nat'l Educ. Support Sys., Inc.*, 994 F.2d 1476, 1498 (10th Cir.1993) ("[A] knowing infringer cannot be 'permitted to construct its business around its infringement.'"), *overruled on other grounds by TW Telecom Holdings Inc. v. Carolina Internet Ltd.*, 661 F.3d 495 (10th Cir. 2011).

### C.    Public Interest.

On this factor, Cargill was required to establish that the issuance of the injunction would not be adverse to the public interest.  Here, the Court must weigh Cargill's interest in preventing the threatened/inevitable use of misappropriated trade secrets with the public's interest in free competition and employment mobility.  Nonetheless, Mr. Kuan argues that he – and JBS – has no interest in Cargill's trade secrets or in using them.  As such, on balance, *if* an injunction from working at JBS is necessary to preclude Mr. Kuan from using trade secrets to Cargill's disadvantage, this factor would weigh in favor of Cargill.

### D.    Likelihood of Success on the Merits.

#### 1.    The Act.

Under the Act, an injunction maybe granted "on such equitable terms as the court deems reasonable to prevent or restrain actual or *threatened* misappropriation of a trade secret."  C.R.S. § 7-74-103 (2013) (italics added).  A "misappropriation" of a trade secret includes the disclosure or use of a trade secret without consent.  C.R.S. § 7-74-102 (2013).  A "trade secret" includes any "confidential business or financial information, listing of names, addresses, or telephone numbers, or other information relating to any business or profession which is secret and of value."  C.R.S. § 7-74-102(4) (2013).  Under Colorado law, the following factors may be

---

[5] This determination should not be interpreted as acceptance by the Court of the propriety of a judicially imposed non-compete provision as the appropriate equitable remedy.

considered in determining whether a trade secret exists:  "(1) the extent to which the information is known outside the business; (2) the extent to which it is known to those inside the business, i.e., by the employees; (3) the precautions taken by the holder of the trade secret to guard the secrecy of the information; (4) the savings effected and the value to the holder in having the information as against competitors; (5) the amount of effort or money expended in obtaining and developing the information; and (6) the amount of time and expense it would take for others to acquire and duplicate the information."  *Hertz v. Luzenac Group*, 576 F.3d 1103, 1108 (10th Cir. 2009) (quoting *Harvey Barnett, Inc. v. Shidler*, 338 F.3d 1125, 1129 (10th Cir. 2003)); *Colorado Supply Co. v. Stewart*, 797 P.2d 1303, 1306 (Colo.App. 1990).

The first question is whether there are trade secrets at issue.  Based on the evidence presented, the Court finds Mr. Kuan had access to and knowledge of Cargill trade secrets during his employment.  For example, Cargill's March 2014 draft Case Ready Strategy (Ex. 10) contains information concerning its strategy process and strategy focus areas, some of which the Court finds would qualify as confidential business or financial information within the meaning of the Act.  On the current record, however, the Court is not persuaded that information several years old would qualify as a "trade secret" subject to protection under the Act.  As such, the Court finds that not all information claimed to be trade secrets are such.

Although there are trade secrets at issue, there is no liability under the Act – and, hence, no likelihood of success on the merits – unless there has been the misappropriation of such trade secrets.  To the extent that Cargill is claiming "actual" misappropriation of trade secrets under the Act by Mr. Kuan's actions in Canada, Cargill has not shown that the *Colorado* Act applies to actions taken in *Canada.*

To the extent that Cargill is claiming there has been "actual" misappropriation in that trade secrets have been divulged in Colorado, the Court finds the evidence insufficient. Pursuant to the Stipulated Order, Mr. Kuan has been – and is – enjoined from disclosing or using any "highly confidential and proprietary business information and trade secrets." No evidence has been provided – or argument has been made – that Mr. Kuan has violated that order. Instead, the evidence shows that Mr. Kuan has complied with the order by, for example, returning Cargill's information and allowing his personal Mac laptop to be forensically examined. And, as demonstrated by the credible testimony of Adam Bode, the head of the JBS's case ready operation, Mr. Kuan has not disclosed Cargill information. There is also no evidence of any impropriety on the part of JBS. Here, JBS requires its employees to refrain from making unauthorized disclosures of competitor's information and there is no evidence that JBS asked Mr. Kuan to obtain such information or hired him in order to do so.

Cargill's evidence that Mr. Kuan purportedly accessed Cargill information after he started working for JBS in August 2014 also falls short. While some form of "access" may have occurred on Mr. Kuan's Mac laptop on September 10, 2014, the type of "access" is unknown. More importantly, there is no evidence Mr. Kuan was in possession of or had access to his laptop that date (or time), and, accordingly, no evidence that it was he who "accessed" such files. Indeed, the evidence shows that some unknown third-party was in possession of that laptop as he or she created a forensic image of Mr. Kuan's laptop that very date. As such, Cargill has not established a likelihood of success on any claim of misappropriation by "actual disclosure."

That leaves the issues of "threatened disclosure" and "inevitable disclosure," theories which Cargill argues it has established. Under such theories, the questions for resolution are

whether Mr. Kuan has "threatened" to disclose or use Cargill's trade secrets and, even if he has

not, whether such disclosure or use is "inevitable." According to Cargill, any threatened and

inevitable disclosure must be prevented and, in order to do so, Mr. Kuan must be precluded from

working for JBS's case ready business.  Cargill argues these theories (concepts) "can" be distinct

but uses one to support the other.

"Threatened disclosure" is a concept clearly included within the Act, but the issue is

whether Cargill has provided sufficient evidence to support this concept.  Cargill argues

"threatened disclosure" has been shown by Mr. Kuan's downloading of thousands of Cargill

Case Ready trade secret documents; subsequent fabrication of his computer backup problems;

inability to determine when he would be using Cargill's trade secrets as he believes they are not

trade secrets; and inability to refrain from using trade secrets because it is impossible to do so,

*i.e.*, inevitability.  Cargill relies on *Xantrex Tech. Inc. v. Advanced Energy Indus., Inc.*, 2008 WL

2185882 (D. Colo. 2008), but *Xantrex*, as with other cases, is fact specific.

In *Xantrex*, among other things, the employee used Xantrex information to create

worksheets for his potential employer's use, while he was employed by Xantrex; upon

resignation, failed to disclose he had a new employer or that his new employer was a competitor;

and, due to such nondisclosure, was allowed to remain at Xantrex and access its trade secrets

thereafter for several weeks.  *Xantrex*, 2008 WL 2185882, at *3-4.  Further, what gave that court

pause when considering threatened disclosure was the former employee's ready recollection of

Xantrex's trade secrets.  Indeed, that court found that a party claiming threatened

misappropriation "must establish more than the existence of generalized trade secrets and

competitor's employment of the party's former employee who has knowledge of trade secrets." *Xantrex*, 2008 WL 2185882, at *19.

The Court agrees with *Xantrex* in that the party claiming threatened disclosure must establish more than the existence of generalized trade secrets. Consistent with *Xantrex*, the Court finds the party seeking relief under the Act must also show that the former employee has more than a generalized knowledge of the trade secrets. Were it otherwise, it would be as if the existence of generalized trade secrets would be sufficient. Here, while the Court finds Mr. Kuan's testimony that he downloaded thousands of documents on July 7 due to laptop problems not credible, Cargill does not dispute that Mr. Kuan returned Cargill's information and, as such, there is no source (via paper or electronically) from which he could obtain or retrieve Cargill's trade secrets, other than what he can recall. However, no evidence was presented of what Mr. Kuan may or could recall that he may or could use to Cargill's competitive disadvantage. Instead, Ms. Horner's inability to recall specifics of Cargill's business plan just minutes after reviewing them demonstrates that it would be difficult, if not impossible, to do so. On the record as a whole, the evidence supports a finding that while Mr. Kuan did once have specific knowledge of Cargill's trade secrets, his knowledge now is generalized. Generalized knowledge that Cargill's strategies focused on areas of Customer, Value Added, OPEX, and CMS Alignment, or generalized knowledge of the information contained in those focus areas, however, are insufficient to support a finding of "threatened misappropriation."

That leaves "inevitable disclosure." The Act speaks not of "inevitable disclosure" but, rather, of "threatened disclosure." The Court need not reach the issue of whether "inevitable disclosure," alone or in conjunction with additional facts, constitutes "threatened disclosure" or

whether the concept of "inevitable disclosure" alone supports a violation of the Act.  On this record, the Court does not find there would be "inevitable disclosure" of Cargill trade secrets. As such, Cargill has not shown a likelihood of success on its claim for violation of the Act.

### 2.      Breach of Contract.

The parties dispute whether the Agreement is unenforceable for lack of consideration.  In order to resolve this issue, the Court must determine which law applies.

In a diversity action, where a contract contains no choice of law provision, the Court applies the choice of law rules of the forum state in which it sits.  *Elliot v. Turner Const. Co.*, 381 F.3d 995, 1001 (10th Cir. 2004).  Colorado has adopted the Restatement (Second) of Conflicts of Laws in resolving contract choice of law questions.  *Wood Bros. Homes v. Walker Adj. Bureau*, 198 Colo. 444, 601 P.2d 1369, 1372 (1979); *Century 21 Real Estate Corp. v. Meraj Intern. Inv. Corp.*, 315 F.3d 1271, 1281 (10th Cir. 2003).  "The objective of the Restatement (Second) is to locate the state having the 'most significant relationship' to the particular issue." *Wood Bros. Homes*, 601 P.2d at 1372.  The state with the most significant relationship is determined by considering the following factors: (1) the needs of the interstate and international systems; (2) the relevant policies of the forum; (3) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (4) the protection of justified expectations; (5) the basic policies underlying the particular field of law; (6) certainty, predictability and uniformity of result; and (7) ease in the determination and application of the law to be applied.  Restatement (Second) of Conflict of Laws §§ 6, 188 (1971). In evaluating these factors, the contacts to be taken into account are: (1) the place of contracting; (2) the place of negotiation of the contract; (3) the place of performance; (4) the location of the

subject matter of the contract; and (5) the parties' domicile, residence, nationality, place of

incorporation and place of business.  Restatement § 188.  These contacts are to be evaluated in

accordance with their relative importance with respect to the particular issue.  Restatement § 188.

The parties ask this Court to select from the law of Canada, Georgia or Minnesota.[6]

Neither party, however, provided the Court must assistance on this issue.  They focused on the

place of contracting, failing to conduct an analysis of the other Restatement factors or contacts.

Cargill relies on Mr. Kuan's Immigration and Naturalization Service ("INS") form to support its

contention that the place of contracting was Georgia as the form provides that Mr. Kuan was

residing in Georgia on January 14, 1999.  (ECF No. 50.)  The reliability of the INS form,

however, is questionable in light of the fact it reflects that when Mr. Kuan worked in Newnan,

Georgia, he worked for *Excel Corporation*, not Cargill.  If the Court were to rely on that form, it

would find the Agreement has no application at all as Mr. Kuan was not employed by Cargill at

that time, a position no party has advocated.  The Court recognizes that because Mr. Kuan's

employment was essentially "headquartered" in Canada, it is plausible he could have also been

performing work in Canada while he was stationed in Georgia.  Nonetheless, the Court does not

find credible Mr. Kuan's bare statement that he recalls that Agreement was signed in Canada.  In

light of the evidence, the Court finds the Agreement was signed in Georgia.

Although, generally, "[s]tanding alone, the place of contracting is a relatively

insignificant contact," Restatement § 188 cmt. e, the Court agrees with the parties that this factor

is the most significant on the issue of whether continued employment is effective consideration.

---

[6] Cargill has apparently abandoned its earlier reliance on Colorado law.  And, of the choice between Georgia or Minnesota, Cargill favors Minnesota arguing it is the "center of Cargill's corporate work."  Cargill's Exhibit 1 (ECF No. 50), however, raises the question of whether the proper focus should be Cargill, Inc. or Cargill Limited, Canada.

As such, the Court finds that Georgia law applies.  And, under Georgia law, an at-will employee's continued employment constitutes valid consideration, *Hiers v. ChoicePoint Servs.*, 270 Ga.App. 128, 606 S.E.2d 29, 31 (2004), an employment status Cargill assumed was that of Mr. Kuan but failed to present evidence to support.[7]  Regardless, even assuming, *arguendo*, the Agreement is enforceable, Cargill nonetheless needed to establish a breach of the Agreement's requirement that Mr. Kuan not "use, disclose or communicate" Cargill's trade secrets.  But, as with the Act, and for the same reasons stated, Cargill has failed to do so.  Therefore, Cargill has also not shown a likelihood of success on the merits of its breach of contract claim.

### IV.  CONCLUSION

In light of the evidence before the Court, Cargill has not demonstrated a likelihood of success on the merits of either claim.  As such, it has also not shown that the other three factors weigh in its favor.  It is therefore

**ORDERED** that Plaintiff Cargill Incorporated's Motion for a Temporary Restraining Order and Preliminary Injunction (ECF No. 2) is **DENIED**.

DATED this 20th day of October 2014.

BY THE COURT:

RAYMOND P. MOORE
United States District Judge

---

[7] If Canada law applies, as the most probable alternate in light of the limited evidence before the Court, continued employment does not constitute valid consideration for a confidentiality agreement signed after the employee began working.  *Kohler Canada Co. v. Porter*, [2002] 26 BLR (3d) 24 at paragraph 31.

16